IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

E. DIANNE JOHNSON,             )
                                  )
          Plaintiff,          )       CV-04-209-ST
                                  )
         v.             )       OPINION AND ORDER
                                  )
THE EVANGELICAL LUTHERAN GOOD  )
SAMARITAN SOCIETY, d/b/a FAIRLAWN  )
GOOD SAMARITAN HEALTH VILLAGE AND  )
HEALTH CENTER,            )
                                  )
         Defendant.        )

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, E. Dianne Johnson ("Johnson"), filed a Complaint against her former employer,

The Evangelical Lutheran Good Samaritan Society, d/b/a Fairlawn Good Samaritan Health

Village and Health Center ("Fairlawn"), on February 13, 2004.  Johnson is an African-American

woman who worked for Fairlawn from April 14, 1980, until Fairlawn placed her on medical

leave in April 2002, and then took her off its payroll in August or September 2002.  Johnson

alleges three claims for damages caused by Fairlawn's termination of her employment:  (1) race

discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) race

discrimination in violation of 42 USC § 1981; and (3) violation of the Americans with

Disabilities Act ("ADA"), 42 USC § 12101 *et seq.*

This court has original jurisdiction over the federal statutory claims under 28 USC § 1331

and supplemental jurisdiction over the state law claims under 28 USC § 1367. All parties have

consented to allow a Magistrate Judge to enter final orders and judgment in this case in

accordance with FRCP 73 and 28 USC § 636(c) (docket #15).

Fairlawn has now filed a motion for summary judgment (docket #24). For the reasons

stated below, Fairlawn's motion is denied.

## <u>LEGAL STANDARDS</u>

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any

material fact and the moving party is entitled to judgment as a matter of law. The moving party

must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323

(1986). Once the moving party does so, the non-moving party must go beyond the pleadings and

designate specific facts showing a genuine issue for trial. *Id* at 324. The court does "not weigh

the evidence or determine the truth of the matter, but only determines whether there is a genuine

issue for trial." *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir 1999). A "'*scintilla* of

evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not

present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865

F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original, citation omitted).

The substantive law governing a claim or defense determines whether a fact is material.

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 631-32 (9th Cir 1987).

The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* at 631 (citation omitted). Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id* at 630-31. However, when the non-moving party's claims are factually "*implausible*, that party must come forward with more persuasive evidence than would otherwise be [required] . . . ." *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F2d 1466, 1468 (9th Cir 1987), *cert denied*, 484 US 1006 (1988) (emphasis in original, citation omitted). "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id*.

The Ninth Circuit has set a high standard for granting summary judgment in employment discrimination cases. "[W]e require very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by the factfinder, upon a full record." *Schnidrig v. Columbia Mach., Inc.*, 80 F3d 1406, 1410 (9th Cir) (internal citations and quotations omitted), *cert denied*, 519 US 927 (1996).

## FACTS

Because all material facts must be viewed in the light most favorable to the non-movant, this court will view the evidence in the light most favorable to Johnson. A review of the parties' fact statements, affidavits, and deposition excerpts,[1] reveals the following facts:

///

///

---

[1] Citations to affidavits and depositions are identified by the last name of the affiant or deponent. Citations are to the paragraph(s) of the affidavit or page(s) of the deposition transcript.

Johnson began working for Fairlawn on April 14, 1980. For 22 years, Johnson worked in various capacities, including a supervisory position for a number of years. As of April 2002, Johnson was working for Fairlawn as a cook/supervisor.

On June 1, 2000, Christina Clemens ("Clemens"), was hired as the Food Services Director for Fairlawn and became Johnson's direct supervisor. Of the 20-30 employees Clemens supervised, Johnson was the only African-American. Clemens Depo, pp. 27-28. Prior to Clemens's arrival, Johnson's job title was that of "chef supervisor." Johnson Depo, p. 83. However, shortly after Clemens's arrival, Johnson's title changed to "cook supervisor" because Clemens objected that Johnson was not a chef. *Id* at 83-84.

Clemens told Johnson she had "never been around a black person before" and that she was "afraid" of Johnson. *Id* at 47-48, 53. Clemens frequently was observed screaming at Johnson for no apparent reason.[2] During the course of her supervision of Johnson, Clemens referred to Johnson as "stupid," stated that Johnson "didn't know what she was doing," that Clemens "just didn't like" Johnson, and that Clemens thought that "everybody would be better off if [Johnson] wasn't there." Boyer Depo, pp. 10-12, 20. Clemens treated Johnson so poorly that Kate Boyer ("Boyer"), a cook and cook's helper who worked for Fairlawn from November 2001 until she resigned in July 2002, concluded that Clemens harbored racial animus toward Johnson. *Id* at 5-6, 22-24, 31-33.

///

///

---

[2] Fairlawn admits several of the factual statements in Plaintiff's Response to Defendant's Concise Statement of Facts only for purposes of summary judgment. Such factual statements are taken as true for purposes of this Opinion and Order.

In the spring of 2001, Fairlawn's chaplain, Don Voeks ("Voeks"), overheard a conversation between Clemens and her supervisor, Lorraine Fox[3] ("Fox"), Fairlawn's Campus Administrator, during which Clemens stated that Johnson is black and that black people do not work as well as white people. Voeks Aff, ¶ 6.

Clemens regularly came through the kitchen "ranting and raving." Boyer Depo, p. 20. Johnson apparently used part of a storage room off of the kitchen as her office. The area was equipped with a desk in which Johnson kept work and personal items. On one occasion, while Johnson was on vacation, Clemens took everything out of the desk and threw it away, including personal items belonging to Johnson. Johnson Depo, pp. 125-27. At Fox's insistence, Clemens later apologized. *Id* at 125-26.

Johnson's job involved two days of administrative duties and two days of cooking per week. Johnson's cooking duties required her to prepare food and show kitchen staff how to prepare the necessary foods when not actually cooking them, and clean up after cooking and show other kitchen staff how to clean up. Johnson also did some catering, sometimes cooked breakfast alone, and put stock away. These job responsibilities involved some degree of walking, standing, bending, and stooping.

In April 2002, Johnson experienced increasing symptoms from a heart murmur, chronic high blood pressure, and vertigo. Johnson Dec, ¶ 3. She was taking blood pressure medication, but the type and dosage of the medication was under review by her doctor. Johnson Depo, pp. 132-33. Around that same time, Cindy Honeycutt ("Honeycutt"), who worked in the office at the Fairlawn "Lodge," overheard Clemens tell Fox that Johnson was "black . . . [and] has to go or I

---

[3] Lorraine Fox's former surname was Powers and many of the documents in the record refer to her by that surname.

go," to which Fox responded "okay, okay, she's black, she's got to go." Honeycutt Depo, pp. 9-11. Honeycutt later volunteered that information to Johnson. Johnson Depo, pp. 61-68.

On April 22, 2002, Johnson came to work for a meeting and discovered that Clemens had destroyed her billboards and taken all her work and personal items off the wall of Johnson's office and "balled it up and threw it in the trash can." Johnson Depo, p. 127. Johnson reported to her meeting, but then her "blood pressure and temper all went up," her vision blurred, and she became extremely lightheaded. *Id* at 135-36. Johnson was then seen by a nurse at Fairlawn, who told her that her blood pressure was "outrageous" and that she needed to go to the hospital immediately. *Id* at 134, 136-40. Johnson reported to the emergency room, and saw her treating physician within three days.

Over the next two months, Johnson provided Fairlawn with several Clinician's Reports of Disability from her treating physician, Dr. B.H. Stone. On May 22, 2002, Dr. Stone certified that Johnson suffers from a "chronic condition of hyperreactivity manifesting as vertiginous syndrome with features of anxiety disorder." Fjelstad Dec, Ex J, p. 1. Those conditions caused Johnson to become very light headed and dizzy when she moved around too quickly or too much. Based on these conditions, Johnson's doctor certified her need for medical leave from April 22 - June 22, 2002.

On June 22, 2002, Dr. Stone released Johnson to work. The release specified that Johnson could stand "frequently," but that she should only "occasionally" walk, and should "rarely" climb, kneel, bend, stoop, crouch, squat, crawl, and twist.[4] Johnson Depo, Ex. 5.

---

[4] Dr. Stone apparently used these descriptive terms after looking at definitions of the terms on a job Profile provided by Fairlawn, as described below. Each term references the range of times a task must be performed in a shift.

Some time prior to 1999, Fairlawn created "Physical and Mental Ability Profiles" for each of its job positions. At or around the same time, Fairlawn implemented physical agility testing for each potential employee. Minter Depo, pp. 10-11. Job offers are conditioned upon the applicant passing the physical agility test which is administered by Fairlawn's Staff Development Coordinator, LaRae Lozon-Minter ("Minter"). *Id* at 10.

Some time after receiving the June 22, 2002 work release from Johnson's doctor (Johnson Depo, Ex 5), Minter – with significant input from Clemens – compared the restrictions indicated by Johnson's doctor with the requirements of the Physical and Mental Ability Profile for the Cook-2 position ("Cook-2 Profile"). Minter Depo, pp. 18-23, 36-38; Johnson Depo, Ex 9. Although Johnson did not hold a Cook-2 position at that time, Minter selected the Cook-2 Profile based on Johnson's statement that she cooked two days per week. Minter Depo, pp. 22-23.

Clemens, Fox, and Minter also considered Johnson for the only position then open at Fairlawn, which was the Activity Assistant position, but again concluded that the restrictions on Johnson precluded her from performing the physical requirements of that job based on a comparison of the restrictions indicated by Johnson's doctor with the job's Physical and Mental Ability Profile. Fox Depo, p. 7; Minter Depo, pp. 34-35. They also met and compiled a proposed new job description as a "Dining Room Assistant," using the restrictions listed in Johnson's work release. Fox Depo, pp. 6-8. However, Julie Locke ("Locke"), the Risk Management Consultant in Fairlawn's corporate headquarters in Sioux Falls, South Dakota, advised them that Fairlawn would not create a new job in this type of situation. *Id* at 7-9.

As far as can be gleaned from the record, Fairlawn never performed any analysis of whether the job Johnson had actually been performing matched up with the requirements listed in the Cook-2 Profile, never asked Johnson anything about how her conditions in fact impacted her life or work, never met with Johnson or requested further information from her doctor, and never had any meaningful discussion of if and how Johnson's medical conditions could be accommodated by the addition of equipment or other means. Minter Depo, pp. 34; Fox Depo, pp. 11-12, 31-32. Instead, based on the comparison of the Cook-2 Profile and the Activity Assistant Profile with Johnson's work release, and a cursory review by Locke, Fairlawn determined that Johnson was not covered by the ADA, that it had no responsibility to create a job for her, and that Johnson was precluded from performing the job she had been performing and the open job as an Activity Assistant because the restrictions suggested by her doctor precluded some of the requirements listed in the Cook-2 and Activity Assistant Profiles.

Minter did give Johnson a copy of the Cook-2 Profile and asked her to take it back to her doctor to see whether he could revise his work release restrictions. Minter Depo, p. 29. However, Minter testified that she never heard back from Johnson.

The record does not reveal any further communication between Johnson and Fairlawn. Fairlawn apparently removed Johnson from its payroll some time in August or September 2002.

As of at least February 2005, Johnson's physical restrictions given in her June 22, 2002 work release had not been lifted. Johnson Depo, pp. 166, 172.

///

///

///

**<u>DISCUSSION</u>**

**I.  <u>Race Discrimination Claims</u>**

    **A.  <u>Legal Standards – Title VII and § 1981</u>**

        Johnson alleges race discrimination claims under both Title VII and § 1981.  Among other things, Title VII prohibits employers from discriminating against "any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . or national origin."  42 USC § 2000e-2(a)(1).  Section 1981 provides as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 USC § 1981(a).

        Although this provision does not itself use the term "race," it is intended and has been interpreted to prohibit race discrimination.  *Keating v. Carey*, 706 F2d 377, 384 (2nd Cir 1983) (noting that § 1981 was enacted in an effort to address the problem of racial discrimination against African-Americans).  Moreover, the 1991 amendments to § 1981 have clarified the meaning of the term "make and enforce contracts" in that provision:

> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 USC § 1981(b).

In accordance with those amendments, § 1981 applies in the employment context to prohibit race-based employment discrimination, including employment discrimination stemming from a hostile work environment. *Manatt v. Bank of Am.*, 339 F3d 792, 797 (9th Cir 2003).

Claims under § 1981 are analyzed using the same legal principles as are claims under Title VII. *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F3d 840, 850 (9th Cir 2004), citing *Manatt*, 339 F3d at 798. To survive summary judgment on a race discrimination claim, the plaintiff must offer evidence that gives rise to an inference of discrimination. A plaintiff who relies on circumstantial evidence of discrimination may establish a *prima facie* case of discrimination through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 US 792 (1973). However, a plaintiff who offers direct evidence of discrimination – that is "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact finder to infer that the attitude was more likely than not a motivating factor in the employer's decision" – then the *McDonnell Douglas* test is inapplicable. *Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F3d 802, 812 (9th Cir 2004), *cert denied*, 125 SCt 1837 (2005) (internal quote marks, citations, and emphasis omitted). *See also Trans World Airlines, Inc. v. Thurston*, 469 US 111, 121 (1985); *AARP v. Farmers Group, Inc.*, 943 F2d 1996, 1000 n7 (9th Cir 1991), *cert denied*, 502 US 1059 (1992). In a case involving direct evidence of discrimination, the plaintiff is entitled to proceed to trial even where the evidence is not particularly specific or substantial:

> The distinction between direct and circumstantial evidence is
> crucial, because it controls the amount of evidence that the plaintiff
> must present in order to defeat the employer's motion for summary

> judgment. Because direct evidence is so probative, the plaintiff
> need offer "very little" direct evidence to raise a genuine issue of
> material fact. But when the plaintiff relies on circumstantial
> evidence, that evidence must be "specific and substantial" to defeat
> the employer's motion for summary judgment.

*Coghlan v. American Seafoods Co., LLC*, 413 F3d 1090, 1095 (9th Cir 2005) (citations and

footnotes omitted).

### B. <u>Direct Evidence of Discrimination Prevents Summary Judgment</u>

Johnson has submitted evidence that a few weeks prior to Mother's Day 2002, Fox and

Clemens had a conversation during which Clemens told Fox that Johnson was "black . . . [and]

has to go or I go," to which Fox responded "okay, okay, she's black, she's got to go." Honeycutt

Depo, pp. 9-11. This is direct evidence of discrimination.

Fairlawn argues that this evidence is irrelevant because the alleged conversation took

place after Johnson left on medical leave on April 22, 2002. However, the record reveals that

Johnson was not terminated by Fairlawn until some time in August or September 2002. Because

the fate of Johnson's employment still hung in the balance at the time of the conversation

overheard by Honeycutt, evidence concerning the motivations of those involved in decisions

related to modifying her work arrangements or terminating her employment are quite relevant.

Moreover, Johnson has also submitted evidence that some time in the spring of 2001, Clemens

and Fox had another conversation, which was overheard by Fairlawn's chaplain, in which they

discussed their views that black people did not work as well as whites. As with the comments

overheard by Honeycutt, this is direct evidence of discriminatory animus on the part of Clemens

and Fox.

///

Citing *Vasquez v. County of Los Angeles*, 349 F3d 634, 640-41 (9th Cir 2003), Fairlawn argues that Johnson cannot prevail even with this evidence because she has failed to show a nexus between the allegedly discriminatory remarks and the employment decision. However, that principle is inapplicable here. Clemens was Johnson's direct supervisor and Fairlawn has admitted that both Clemens and Fox participated in the decision to terminate Johnson's employment. Unlike *Vasquez* and the cases on which it relies, Fairlawn has failed to submit evidence that Locke conducted her own thorough or independent investigation prior to making the decision to terminate Johnson. To the contrary, the evidence indicates only cursory involvement by Locke and reveals nothing about what transpired when Johnson was eventually taken off of Fairlawn's payroll.

Thus, armed with direct evidence that is sufficient to allow a fact finder to conclude that Clemens and Fox were motivated by racial animus, Johnson's race discrimination claims necessarily withstand Fairlawn's request for summary judgment. Accordingly, to the degree it is aimed at Johnson's race discrimination claims, Fairlawn's motion is denied.

## II. <u>ADA Claim</u>

The ADA provides that no covered employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 USC § 12112(a). To establish a *prima facie* case of employment discrimination under the ADA, the plaintiff must prove three elements: (1) the plaintiff is disabled within the meaning of the ADA; (2) the plaintiff is a qualified individual able to perform the essential functions of the job, either

with or without reasonable accommodations; and (3) his employer terminated him because of his disability. *Nunes v. Wal-Mart Stores, Inc.,* 164 F3d 1243, 1246 (9th Cir 1999) (citation omitted).

There appears to be no dispute that Johnson suffered an adverse employment action when she was terminated from her job with Fairlawn. Thus, the issues are whether Johnson was disabled within the meaning of the ADA and whether she was a qualified individual able to perform the essential functions of the job.

Before turning to those issues, however, this court must first clarify the type of claim Johnson alleges.

**A.  ADA Claims Alleged by Johnson**

Several types of claims may be brought under the ADA, including claims for disparate treatment, disparate impact, and failure to accommodate. A plaintiff "need not allege either disparate treatment or disparate impact in order to state a reasonable accommodation claim." *McGary v. City of Portland*, 386 F3d 1259, 1266 (9th Cir 2004) (citation omitted). A disparate treatment claim alleges that the disabled employee was treated differently than other non-disabled employees, and is distinct from a claim alleging that the employer failed to accommodate a disability:

> Recently, we have decided several reasonable accommodation cases in this circuit . . . . [L]ike [those cases], this is not a disparate treatment claim, but a reasonable accommodation claim, and it must be analyzed differently. [Plaintiff] is not complaining that [the employer] treated him differently and less favorably than other, non-disabled employees. [Plaintiff] is not comparing his treatment to that of any other . . . employee. [Plaintiff's] complaint relates solely to [the employer's] failure to reasonably accommodate his disability.

*Bultemeyer v. Fort Wayne Community Schools*, 100 F3d 1281, 1283 (7th Cir 1996), *cited with approval in McGary.*

As in *Bultemeyer* and *McGary*, Johnson does not allege a disparate treatment claim because she does not allege that Fairlawn treated her differently and less favorably than other non-disabled employees. Nor does she allege a claim for disparate impact, which involves an allegation that a facially neutral employment policy has a discriminatory impact on a protected class. *Raytheon Co. v. Hernandez*, 540 US 44, 52 (2003); *Tsombanidis v. West Haven Fire Dept.*, 352 F3d 565, 574-75 (2nd Cir 2003). Instead, Johnson alleges that Fairlawn failed to provide her with a reasonable accommodation and failed to engage in the interactive process necessary to identify such an accommodation. Complaint, ¶ 27.

Once an employer is alerted to the need for accommodation, the ADA imposes a "mandatory rather than a permissive obligation" on employers to engage in an interactive process with employees in an effort to determine a reasonable accommodation. *Barnett v. U.S. Air, Inc.*, 228 F3d 1105, 1114 (9th Cir 2000), *vacated on other grounds*, 535 US 391 (2002).[5] As noted in *Bultemeyer*, the ADA defines "discriminate" as "'not making reasonable accommodations'" or "'denying employment opportunities . . . if such denial is based on the need of the [employer] to make a reasonable accommodation.'" *Bultemeyer*, 100 F3d at 1283, quoting 42 USC § 12112(b)(5)(A)-(B). A failure to accommodate claim, which is premised upon this statutory

---

[5] The Supreme Court decision vacating the Ninth Circuit's decision in *Barnett* did not address the issue of whether the interactive process was a mandatory obligation, but instead decided the issue of whether seniority rules must give way to requests for accommodation. Since then, the Ninth Circuit has cited its *Barnett* decision with approval insofar as it addresses the issue of the employer's obligation to engage in the interactive process. *Zivkovic v. Southern Cal. Edison Co.*, 302 F3d 1080, 1089 (9th Cir 2002) ("In *Barnett*, we held that once an employee requests an accommodation or an employer recognizes the employee needs an accommodation . . . the employer must engage in an interactive process with the employee to determine the appropriate reasonable accommodation") (citation omitted).

language, requires the employer to accommodate the "known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer demonstrates that the accommodation would impose an "undue hardship" on the operation of the employer's business. 42 USC § 12112(b)(5)(A).

The term "reasonable accommodation" may include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 USC § 12111(9).

Because the type of claim asserted in turn determines the method of proof, it is important to determine the nature of the claim a plaintiff is alleging:

> Disparate treatment claims are analyzed somewhat differently than failure to accommodate claims. In disparate treatment claims, the *McDonnell Douglas* burden-shifting framework commonly employed in Title VII and ADEA actions is generally appropriate, whereas in failure to accommodate claims the *McDonnell Douglas* framework is unnecessary and inappropriate. Accordingly, it is important for the plaintiff to be clear about the nature of the claim he or she is asserting.

*Weigel v. Target Stores*, 122 F3d 461, 464 (7th Cir 1997) (citations and internal punctuation omitted).

Because Johnson alleges a claim for failure to accommodate, the *McDonnell Douglas* method of proof is "unnecessary and inappropriate." Instead, the issue is whether sufficient

evidence in the record supports the inference that Fairlawn failed to accommodate Johnson's disability.

Fairlawn only had a duty to accommodate Johnson's disability if Johnson was a "qualified individual" with a "disability." Fairlawn disputes that Johnson had a "disability" and also contends that Johnson was not a "qualified individual" because the physical restrictions prescribed by her doctor prevented her from performing the essential functions of her job with or without reasonable accommodations.

## B. Actual Disability

Under the ADA, a "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the individual's major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 USC § 12102(2). Johnson seeks to establish a violation based on the two alternative prongs of an "actual" disability and being "regarded as" having a disability.

However, there is no duty to accommodate where the claim is strictly premised upon being "regarded as" disabled. *See*, *Kaplan v. City of North Las Vegas*, 323 F3d 1226, 1232 (9th Cir 2003), *cert denied*, 540 US 1049 (2003). Thus, in order to prevail on her claim that Fairlawn failed to provide a reasonable accommodation, Johnson may not rely on a "regarded as disabled" theory, but must establish that she has an actual disability.[6] Accordingly, the issue on summary

---

[6] Johnson also alleges that Fairlawn failed to engage in the interactive process with her to identify a reasonable accommodation. It is unclear whether a failure to engage in the interactive process will support a claim wholly independent from a failure to accommodate claim. If so, and if Johnson's actual disability claim is rejected, then it may be necessary to decide whether such a claim may be premised on a "regarded as" disabled theory. However, this court need not and does not address those issues at this juncture. Johnson has submitted sufficient evidence of an actual disability to preclude summary judgment and that theory will support either claim. Should this case proceed to trial, this court will entertain further briefing on these two as yet unresolved issues.

judgment is whether she has submitted sufficient proof of an actual disability to proceed to trial. This court concludes that she has.

## 1.  Legal Standards

Not every impairment constitutes a disability.  Instead, the impairment must substantially impact a major life activity.  *Toyota Motor Mfg. Kentucky, Inc. v. Williams*, 534 US 184 (2002). Major life activities may include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning," and also "working." 29 CFR § 1630.2(i).  An activity is "substantially limited" when an individual cannot perform the activity that an average person in the general population could perform or faces significant restrictions in the "condition, manner, or duration under which the individual can . . . perform [the] activity." 29 CFR § 1630.2(j)(i)-(ii).

An ADA claimant cannot rely solely on a medical diagnosis, but instead must offer "evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial."  *Toyota Motor Mfg., Kentucky, Inc.,* 534 US at 198, quoting *Albertson's, Inc. v. Kirkingburg,* 527 US 555, 567 (1999) (internal punctuation omitted). Additionally, the inquiry must focus on the effect of the impairment on the individual's daily life, not on the individual's ability to perform a specific job.  *Id* at 200-01.  The Supreme Court squarely rejects the idea that "the question of whether an impairment constitutes a disability is to be answered only by analyzing the effect of the impairment in the workplace."  *Id* at 201. Instead, courts must consider evidence that an individual can do household chores and tend to personal hygiene, which are the types of manual tasks of central importance to most people's daily lives.  *Id.*

///

Moreover, "[a] person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity." *Sutton v. United Air Lines*, 527 US 471, 482-83 (1999).

## 2. Johnson's Impairments

Johnson suffers from the medical impairments of high blood pressure, a heart murmur and a "chronic condition of hyperreactivity manifesting as vertiginous syndrome with features of anxiety disorder." Fjelstad Aff, Ex J, p. 1. She claims that these impairments cause her to become very light headed and dizzy when she moves around too much, particularly if [she forgets] to take [her] medicines." Johnson Aff, ¶ 3. The record reveals that Johnson's condition may be at least partially amenable to treatment with medications. However, the only reference in the record to medications are to those for high blood pressure, which may or may not address the "hyperreactivity" condition diagnosed by her doctor. Thus, it appears that, not unlike an individual with diabetes, Johnson may have a permanent and severe condition which requires monitoring and which can cause intermittent debilitating episodes. At least at the relevant time in April 2002, Johnson's condition was such that it could cause her to have a "spell," rocketing her blood pressure upward and necessitating a visit to the emergency room.

As a result, Johnson contends that she is substantially limited in the major life activities of walking, caring for herself, and working, among others. Due to the restrictions prescribed by her doctor, she also is limited in her ability to climb, kneel, bend, stoop, crouch, squat, crawl, and twist.

///

///

### a. **Physical Restrictions**

Using the ranges found in the Cook 2 Profile, Johnson's doctor indicated that Johnson could stand "frequently" (between 2.5 and 5.5 hours in an 8 hour shift), walk "occasionally" (0 to 2.5 hours in an 8 hour shift), and climb, kneel, bend, stoop, crouch, squat, crawl and twist "rarely" (15-30 minutes per 8 hour shift). Johnson's doctor imposed no lifting restriction presumably because the Cook-2 Profile contains no lifting requirement.

The difficulty with the physical restrictions prescribed by Johnson's doctor is that they are specific to one job. "[O]ccupation-specific tasks may have only limited relevance to the manual task inquiry." *Toyota Motor Mfg., Kentucky, Inc.,* 534 US at 201. The issue is whether Johnson is substantially restricted in her mobility as compared to the manner or duration that an average person in the general population can perform these same physical activities.

A "substantial limitation" is not a mere difference in an ability to perform a particular act. *Albertson's, Inc. v. Kirkingburg,* 527 US 555, 565 (1999). The ADA is concerned only "with limitations that are in fact substantial." *Id.* Some impairments are substantially limiting on their face. For example, a multiple sclerosis patient was disabled within the meaning of the ADA upon a showing that she could not lift more than 15 pounds absolutely. *Lowe v. Angelo's Italian Foods, Inc.,* 87 F3d 1170, 1174 (10th Cir 1996). But where an impairment is not so severe that it is "substantially limiting on its face," an ADA plaintiff must present "evidence comparing her . . . restrictions to that of an average person." *Lusk v. Ryder Integrated Logistics*, 238 F3d 1237, 1240-41 (10th Cir 2001).

"Ninth Circuit precedent does not require comparative or medical evidence to establish a genuine issue of material fact regarding the impairment of a major life activity at the summary

judgment stage. Rather . . . a plaintiff's testimony may suffice to establish a genuine issue of material fact." *Head v. Glacier Northwest, Inc.*, 413 F3d 1053, 1058 (9th Cir 2005) (citations omitted). However, "conclusory declarations are insufficient." *Id* at 1059.

Although Dr. Stone limited the duration of Johnson's walking, standing, squatting, and other movements during each workday, Johnson testified that she cannot think of any life activity that she cannot do, other than such vigorous outdoor activities as skydiving, mountain climbing, hiking and skiing. Johnson Depo, pp. 177-78. Based on this testimony, she presumably is able to perform many everyday tasks, such as vacuuming, cleaning, carrying groceries, and forms of exercise, that an average person can perform easily. Johnson does not describe any substantial limitations on her day-to-day activities nor does she present any comparative evidence as to the general population's capabilities. Rather, Johnson's evidence concentrates on how Fairhaven erroneously concluded that her impairments prevent her from performing the specific duties of her assigned job. *See* Johnson Dec, ¶ 4.

Furthermore, case law from other circuits suggests that the duration of Johnson's ability to stand and walk are not disabling. *See Taylor v. Pathmark Stores, Inc.,* 177 F3d 180, 183 (3rd Cir 1999) (holding that cashier who could only stand for 50 minutes without rest was no different than average person with respect to standing and, therefore, was not disabled under ADA); *Kelly v. Drexel Univ.*, 94 F3d 102, 103-04 (3rd Cir 1996) (affirming summary judgment and noting that "comparatively moderate restrictions on the ability to walk are not disabilities").

Therefore, Johnson has failed to create a genuine issue of material fact that she is substantially limited in the major life activities of walking, caring for herself, and in her ability to

stand, climb, kneel, bend, stoop, crouch, squat, crawl, and twist.  She may be impaired in these activities, but not to the degree necessary to have a disability under the ADA.

### b. Working

Pursuant to EEOC regulations, "working" constitutes a major life activity.  29 CFR § 1630.2(i) (1999).  An individual is "substantially limited" from working if she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities."  *Deppe v. United Airlines,* 217 F3d 1262, 1265 (9th Cir 2000), quoting 29 CFR § 1630.2(j)(3)(i)).  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.  *Id.*

The EEOC regulations further state that additional factors may be considered in order to determine whether or not an individual is substantially limited in the major life activity of working. *See* 29 C.F.R. § 1630.2(j)(3)(ii). These considerations are:

> (A) The geographical area to which the individual has reasonable access;
> (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs) and/or;
> (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

*Id.*

The interpretative guidance further states that the factors listed in 29 CFR § 1630.2(j)(3)(ii) "are not intended to require an onerous evidentiary showing. Rather, the terms

only require the presentation of evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs (e.g. 'few,' 'many,' 'most') from which an individual would be excluded because of an impairment." *Id.*

Neither party has presented testimony by a rehabilitation counselor whether Johnson would be precluded from employment in a wide range of jobs in the relevant geographic area. However, plaintiffs who claim that they are disabled from working need not present demographic job data in order to survive summary judgment. The EEOC the regulations say only that information on other available jobs in the relevant job market "may" be considered along with the primary factors that govern disability, which concern the severity of the impairment in question. *See* 29 CFR § 1603.2(j)(2)(ii) (1999). *Also see Wellington v. Lyon County Sch. Dist.,* 187 F3d 1150 (9th Cir 1999) (an ADA plaintiff may raise a triable issue of fact with a letter from his or her doctor, even without data from a vocational expert.)

Moreover, according to Fairhaven, Johnson was physically unable to perform any cook position within its facility. Clemens Depo, pp. 110-11. In fact, Clemens, who is familiar with the cook industry both inside and outside of Fairlawn, stated that cooking jobs all require the same amount of bending, stooping, kneeling, etc. as Johnson's position at Fairlawn. *Id* at 114-15. From this testimony, a reasonable inference can be drawn that Johnson's physical restrictions prevented her from working anywhere as a cook. If she could not work as a cook, it also is reasonable to infer that she is precluded from a broad range of jobs based on her level of skill, education, and experience. In addition, Fairhaven's broad, internal search for a position for Johnson produced no job that Johnson could fill within her physical restrictions. Fox Depo, pp. 53-56. Thus, Fairhaven admits that Johnson was unable to fill any position among a diverse

range of jobs.  The results of this search and Clemens' testimony are sufficient to create a

genuine issue of fact as to whether Johnson was substantially impaired in the major life activity

of working.

### C.  **Qualified Individual**

The ADA defines a "qualified individual" as "an individual with a disability who, with or

without reasonable accommodation, can perform the essential functions of the employment

position that such individual holds or desires."  42 USC § 12111(8).  The term "essential

functions" means the "fundamental" duties, not the "marginal functions of the position."  29 CFR

§ 1630.2(n)(1).  The EEOC provides the following non-exclusive list of types of evidence which

may be considered in determining the essential functions of a position:  (1) the employer's

judgment as to which functions are essential; (2) written job descriptions prepared before

advertising or interviewing applicants for the job; (3) the amount of time spent on the job

performing the function; (4) the consequences of not requiring the incumbent to perform the

function; (5) the terms of a collective bargaining agreement; (6) the work experience of past

incumbents in the job; and (7) the current work experience of incumbents in similar jobs.

29 CFR § 1630.2(n)(3).

The record in this case reveals a glaring factual dispute over the "essential functions" of

the job Johnson held in April 2002.  Fairlawn argues that Johnson was required to cook two days

per week at her job and that the cooking aspect of her job required physical abilities as described

in the Cook-2 Profile, including the ability to:  (1) stand "continuously," which Fairlawn define

as between 5.5 and 8 hours per shift; (2) walk "frequently," which Fairlawn defines as between

2.5 and 5.5 hours per shift; and (3) climb (ladders or step stools), kneel, bed/stoop, crouch, squat,

crawl, and twist "occasionally," which Fairlawn defines as between 0.0 and 2.5 hours per shift. Johnson Depo, Ex 9.

Johnson does not appear to dispute that cooking – and instructing others how to cook – was an essential function of her cook/supervisor position. However, she disputes that her position ever required her to stand more than 5.5 hours per shift or walk for more than more than 2.5 hours per shift. She also testified that on the two days per week she cooked, she did not "cook the full eight hour shift," and that her job required only "limited" – and not "high maintenance" – stooping or bending. Johnson Depo, pp. 87, 95, 97. Boyer testified that Johnson was not a Cook-2, and was instead "the manager over the whole kitchen" when she worked there in late 2001 through mid-2002. Boyer Depo, pp. 25-26. She also testified that the cook job required less than 30 minutes per shift stooping, twisting, or crouching, and that Johnson's job did not require her to stand for 5.5 hours per shift. *Id* at 27-29. Although a lot of standing was involved in the cook job, the kitchen had sufficient space to allow cooks to sit on a stool when preparing food. *Id* at 28. Johnson would not have had to stand for 5.5 half hours because she had a desk and a chair and she could have taken a break to do paperwork. *Id* at 28-29.

Fairlawn repeatedly asserts that Johnson "admitted" that she cannot do the cook position, based on statements she apparently wrote in a letter to an unidentified woman named "Martha" on October 4, 2002, which Johnson apparently sent after she was taken off of Fairlawn's payroll. Johnson Depo Ex 18. However, that document is unauthenticated and, in any event, challenges Fairlawn's use of the "cook" Profile, as well as generally supporting Johnson's assertion that she was told she might be able to work in a different capacity at Fairlawn.

The record reveals that Fairlawn's supervisory employees assumed that the essential functions of the "cooking" aspect of Johnson's job included all the specifications of physical abilities required under the Cook-2 Profile. The difficulty with that approach is that the lack of any established link between the cook/supervisor job Johnson was performing and the job requirements listed in the Cook-2 Profile. The Physical and Mental Abilities Profiles were created by Fairlawn's corporate office some time prior to 1999. The record does not reveal the analysis that went into creating those Profiles. Moreover, it is undisputed that no individual analysis was ever conducted as to whether the Profiles accurately reflected the work performed by Johnson or any other cook at Fairlawn. Fox Depo, pp. 31-32; Minter Depo, pp. 11-12, 25-26. Fairlawn's failure to conduct any analysis in that regard undermines its contention that the requirements listed in the Cook-2 Profile are essential functions of the position Johnson held. *See, e.g. King v. Town of Wallkill*, 302 FSupp2d 279, 290 (SDNY 2004) (noting that "defendants have not cited testimonial evidence to support the contention that certain enumerated physical abilities are absolutely essential for performance of the position" and denying summary judgment regarding whether plaintiff was a qualified individual with a disability). Given that there is no proof that the physical abilities listed in the Cook-2 Profile were an "inevitable" part of the cooking portion of the cook/supervisor position, a disputed factual issue exists over whether those requirements were essential functions of that position. *See, Cripe v. City of San Jose*, 261 F3d 877, 887-88 (9th Cir 2001) (factual dispute over whether the ability to make a forcible arrest was an essential function of all the positions plaintiffs sought precluded summary judgment).

A reasonable reading of the record is that Fairlawn believed that the Cook-2 Profile trumped all else; if Johnson's work release restrictions varied from the Cook-2 Profile, then

Johnson was unable to perform the essential functions of her job, with or without a reasonable accommodation, and was not a "qualified individual." However, Johnson has submitted evidence that she could perform her job before April 22, 2002, apparently with the same disabilities that she had after that date. If Fairlawn is correct that the Cook-2 Profile accurately describes Johnson's job, then either those functions were not essential or Johnson previously had performed those essential functions with a reasonable accommodation by Fairlawn. If Fairlawn refused to return Johnson to her prior job with those same accommodations, then it failed to continue to reasonably accommodate her.

As the evidence reveals, a genuine issue of material fact exists as to whether the two days Johnson spent per week performing the essential function of "cooking" required the physical abilities listed in the Cook-2 Profile on which Fairlawn relied when it decided that Johnson could not perform the essential functions of her job. Accordingly, Fairlawn is not entitled to summary judgment on the basis of its contention that Johnson could not perform the essential functions of the position she held in April 2002 with or without a reasonable accommodation.

## ORDER

For the reasons stated above, Fairlawn's Motion for Summary Judgment (docket #24) is DENIED.

Dated this 23rd day of August, 2005.


_/s/ Janice M. Stewart _____
Janice M. Stewart
United States Magistrate Judge